**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MATTHEW MUELLER and MARY
MUELLER as Co-Next Friends for
E.M., a minor,

     Plaintiffs,                          Case No.

vs.                                  U.S. District Judge
                                     U.S. Magistrate Judge

OXFORD COMMUNITY SCHOOL
DISTRICT, SHAWN HOPKINS,
NICHOLAS EJAK, TIMOTHY
THRONE, STEVEN WOLF, in their
individual capacities, KENNETH
WEAVER, in his official capacity,
and ACME SHOOTING GOODS,
LLC,

     Defendants.

_____/

## <u>COMPLAINT FOR EQUITABLE AND INJUNCTIVE RELIEF AND DAMAGES</u>

     NOW COME Plaintiffs MATTHEW and MARY MUELLER, as Co-Next Friends for their son E.M., a minor, by and through their attorneys, SOMMERS SCHWARTZ, P.C., and state the following for their Complaint against the Defendants:

### INTRODUCTION

     This case is about the tragic but foreseeable consequences of school officials at the Oxford Community School District ("OCSD") recklessly creating or exacerbating the risk of a mass shooting at Oxford High School through acts showing a deliberate indifference to the safety and constitutional rights of Oxford High School students and a gun dealer choosing to negligently and unlawfully sell a firearm.

Educators like the OCSD officials assume a duty to teach and protect our children from foreseeable threats including, unfortunately, the increasingly prevalent school shootings ravaging this nation.

Gun dealers, when they enter the business of selling guns, assume a duty to comply with all standards of reasonable care and all relevant state and/or federal firearms laws in order to keep guns out of the hands of criminals, juveniles and dangerous parties likely to misuse firearms.

When those within systems we trust breach their duty to respond to imminent threats of gun violence with care, sensitivity and sobriety and/or to prevent prohibited or otherwise dangerous parties from acquiring firearms, mass shootings like the November 30, 2021 attack at Oxford High School are a predictable result.

Here, upon information and belief, OCSD officials breached their duty of care by creating or exacerbating the risk that the shooter would use a firearm in a mass shooting at Oxford High School by ignoring clear signals of impending gun violence from the shooter and engaging in acts or omissions which foreseeably emboldened, motivated or enabled the shooter to successfully engage in the November 30, 2021 shooting. But for these acts by OCSD officials, the shooter would have been disarmed, detained or otherwise prevented from engaging in the November 30, 2021 mass shooting.

In addition, upon information and belief, Acme Shooting Goods, LLC ("Acme") negligently and/or unlawfully supplied the minor shooter with a firearm he could not lawfully possess by providing the gun (hereafter, the "Acme gun" as defined below) to the shooter's father despite actual and/or constructive knowledge that the father was engaging in an illicit straw purchase (as defined below) and that the Acme gun was

intended for the shooter.  But for Acme's decision to place profit over public safety by illegally putting the Acme gun in the hands of a juvenile likely to misuse it, the shooter would not have been able to use the Acme gun in the November 30, 2021 shooting.

It was eminently foreseeable that an act of gun violence like the mass shooting was a probable consequence of their negligent and/or unlawful misconduct. Thus, the negligent and/or unlawful misconduct of both OCSD and Acme directly and proximately contributed to the harm inflicted upon various Oxford High School Students on November 30, 2021.

While the shooter can and should face criminal accountability for his role in the shooting, our system of civil justice entitles the families of students killed or injured during the mass shooting at Oxford High School to hold Acme and OCSD to account for their contributions to this tragedy.

One of the victimized students was E.M.

His parents now appear before this Court to vindicate his right to redress and to prevent similar systemic failures from happening again and contributing to the epidemic of gun violence affecting our youth.

Since the November 30, 2021, the OCSD and its officials have repeatedly told the Oxford community that Nicholas Ejak ("Ejak") and Shawn Hopkins ("Hopkins") had no choice but to send the shooter back to class because their school policy was such that unless there was a disciplinary issue they could neither send a student home nor detain them in the counseling office. The OCSD has claimed that because E.C. did not present a disciplinary issue, its employees had no choice but to return E.C. to class.  OCSD has advanced this "adherence to policy" explanation in a transparent attempt to cover up its

3

own culpability in this tragedy.  However, the truth is that school officials escalated the danger by releasing the shooter back into the school population from a place of safety and security.  They did this despite knowing of the shooter's desire to inflict harm on himself and/or others. These school officials compounded the danger to Oxford High School students by releasing him from a safe zone with an unsearched backpack that contained the deadly weapon that the shooter used to carry out his suicidal or homicidal plans.

E.M. survived the shooting but has suffered irreparable harm. In addition to his other claims as set forth in his Complaint, he brings this action against Kenneth Weaver, the current Superintendent of the Oxford Community School District, not for damages, but for prospective equitable and injunctive relief to restore his right to a full public education.  This right is protected as a property interest under the Due Process Clause of the Fourteenth Amendment. E.M. asks the Court to order Superintendent Weaver to protect his interests by ordering a root cause analysis of the November 30th incident that is transparent and shared with the public, and to take prospective measures to ensure that the OCSD complies with its constitutional obligations to safeguard the safety of its students, including training its administrators, such as Ejak and Hopkins, not to release suicidal students back into the classroom when there is probable cause to know that doing so will result in deadly violence.

## JURISDICTION AND VENUE

1.     This cause of action arises under the U.S. Constitution and the laws of the United States, including the Fourteenth Amendment to the U.S. Constitution and 42

U.S.C. §§ 1983, and under the constitution, statutes and common law of the State of Michigan.

2.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. §1983.

3.      This Court should exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same facts as the federal claims and all claims are part of the same case or controversy.

4.      Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b)(1)-(2) because all facts alleged in this Complaint occurred in Oakland County, Michigan and all parties reside within the Eastern District of Michigan.

## THE PARTIES

5.      Mary and Matthew Mueller are the parents of E.M., a fourteen-year-old child who was the victim of a gunshot with the bullet traveling through his hand and into the face, causing serious injuries and damages while a student at Oxford High School on November 30, 2021.  They bring this action in their capacity as the Co-Next Friends of Minor Plaintiff, E.M. against the Defendants for the severe and grievous injuries E.M. suffered.  Mary and Matt Mueller are not seeking damages for themselves individually and are proceeding here only for the sole benefit of their son.

6.      At all relevant times hereto, E.M. has resided with his parents, Mary and Matthew Muller, in the Township of Oxford, County of Oakland, State of Michigan.

7.      Defendant Oxford Community School District ("OCSD") is a municipal corporation organized and carrying out its functions in the Township of Oxford, County of Oakland, State of Michigan. OCSD's functions include all operations at Oxford High

5

School, including but not limited to funding, staffing, training, supervising the staff, counselors, and teachers at Oxford High School, and maintaining the safety and security of school facilitates for the education and general welfare of OCSD students.

8.      OCSD is being sued pursuant to 42 U.S.C. § 1983 for its official policies, practices, and customs, which were the motivating force and cause-in-fact for the decision to return E.C. from the safety and security of the counseling office to the classroom on November, 30, 2021.

9.      Defendant Shawn Hopkins ("Hopkins") is a citizen of the State of Michigan and at all relevant times was acting under the color of state law within the course and scope of his employment as a counselor at Oxford High School in the Defendant OCSD. Hopkins is being sued pursuant to 42 U.S.C. § 1983, violation of Plaintiff's substantive due process right to bodily integrity pursuant to the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Michigan Constitution, Article 1, §17, gross negligence under state law, and failure to report pursuant to the Child Protection Act.

10.      Defendant Nicholas Ejak ("Ejak") is a citizen of the State of Michigan and at all relevant times was acting under the color of state law within the course and scope of his employment as Dean of Students of the Defendant OCSD.  Ejak is being sued pursuant to 42 U.S.C. § 1983, violation of Plaintiff's substantive due process right to bodily integrity pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Michigan Constitution, Article 1, §17, gross negligence under state law, and failure to report pursuant to the Child Protection Act.

11.     Defendant Timothy Throne ("Throne") is a citizen of the State of Michigan and at all relevant times was acting under the color of state law within the course and scope of his employment as Superintendent of the OCSD.  Throne is being sued pursuant to 42 U.S.C. § 1983, and for his gross negligence under state law.

12.     Defendant Steven Wolf ("Wolf") is a citizen of the State of Michigan and at all relevant times was acting under the color of state law within the course and scope of his employment as Principal of Oxford High School within Defendant OCSD.  Wolf is being sued pursuant to 42 U.S.C. § 1983, and for his gross negligence under state law.

13.     OCSD, Hopkins, Ejak, Throne, Wolf and/or other currently unidentified school officials are referred to collectively as "the Oxford Defendants".

14.     Defendant Ken Weaver ("Weaver") is a citizen of the State of Michigan and is currently the Superintendent of OCSD.  Weaver has been named in this Complaint in his official capacity only and is not included within "the Oxford Defendants" who are being sued for damages.  Weaver is being sued pursuant to 42 U.S.C. § 1983 for prospective equitable and injunctive relief because he is the highest-ranking official of OCSD and is responsible for ensuring the District's compliance with state and federal laws, including the Fourteenth Amendment's Due Process Clause.

15.     Defendant Acme Shooting Goods, LLC ("Acme") is a limited liability company selling firearms, including the one that was sold to James Crumbley and E.C. and subsequently used in the shooting at Oxford High School on November 30, 2021. Defendant Acme conducts business in the Township of Oxford, County of Oakland, State of Michigan.  Acme is being sued for negligence, negligent entrustment, and public nuisance.

7

## STATEMENT OF FACTS

### A. Unfortunately, for many years now in the United States, school shootings have been a real and ongoing threat in our K-12 schools.

16.    From 2009 to 2019, school shootings occurred in over 177 schools in the United States, resulting in 356 deaths.[1]

17.    CNN's investigation into 10 years of shootings on K-12 campuses found two truths: (1) school shootings are increasing, and (2) no type of community is spared.

18.    In 2021 alone, there were 202 incidents of gunfire on school grounds, resulting in 49 deaths and 126 injuries.[2]

19.     To date, at least 27 school shootings have occurred in 2022[3] – including a massacre at an elementary school in Uvalde, Texas which claimed the lives of 19 students and 2 teachers.[4]

20.    It is well established that many shooters in mass shooting events were suicidal before the attack commenced.[5]

21.    A recent study of 134 schools and attempted school shootings found that 91% of the shooters were students or former students, 98% were males, 87% were in crisis before the shooting and 80% were suicidal before the attack.[6]

---

[1] *Ten Years of School Shootings*, CNN (July 2019)
https://www.cnn.com/interactive/2019/07/us/ten-years-of-school-shootings-trnd/.
[2] *Gunfire on School Grounds in the United States*, EVERYTOWN RESEARCH & POLICY (2021)
https://everytownresearch.org/maps/gunfire-on-school-grounds/.
[3] Jaclyn Diaz, *27 School Shootings Have Taken Place So Far This Year,* NPR (May 25, 2022),
https://www.npr.org/2022/05/24/1101050970/2022-school-shootings-so-far.
[4] Holly Yan, *What We Know About The Victims of Robb Elementary School*, CNN (June 6, 2022),
https://www.cnn.com/2022/05/25/us/victims-uvalde-texas-school-shooting/index.html.
[5] Maggie Koerth, *Can We Prevent Mass Shootings By Preventing Suicide?* FIVETHIRTYEIGHT (Aug. 22, 2019),
https://fivethirtyeight.com/features/can-we-prevent-mass-shootings-by-preventing-suicide/.
[6] *Key Findings: Analysis of School and Workplace Shootings*, THE VIOLENCE PROJECT, (2019 Data)
https://www.theviolenceproject.org/mass-shooter-database-3/key-findings/.

22.    The State of Michigan, in recognition of the risks of school mass shootings and gun violence, has enacted legislation mandating that school districts adopt school safety policies.

23.    This legislation includes the Child Protection Law, MCL §777.621 (1975); Statewide School Safety Information Policy, MCL §380.1308 (1999); Mandatory incident reporting to state police for certain crimes occurring at school, MCL §380.1308a (2019); Liaison for school safety commission requirements, MCL §380.1241 (2019); Office of School Safety, MCL §28.681 (2019); Reporting of Crimes on the District's Website, MCL §38.1310a (2000); Student Safety Act, MCL §752.911 (2000); Save Our Students Act, MCL §380.1893 (2020); Searching Student Lockers, MCL §380.1306 (2000); and Student in Possession of a Dangerous Weapon, MCL §380.1313 (1987).

24.    Tragically, gun violence in schools is a foreseeable risk which creates a school official's duty to confront and de-escalate known threats of violence at school, including potential school shootings.

25.    Eliminating or minimizing the risk of gun violence in schools is an essential part of the duties of school administrators, teachers, and counselors as a matter of state and federal law.

**B. In the days and weeks leading up to the November 30, 2021, mass shooting at Oxford High School, there were warning signs of impending violence that were ignored and/or minimized by school officials.**

26.    E.C. was fourteen-years-old and a tenth-grade student at Oxford High School on November 30, 2021.

27.     In the months leading up to the shooting, E.C. was known to Oxford High School and OCSD teachers, counselors, and administrators for his concerning behavior that indicated psychiatric distress, suicidality, and the possibility of child abuse or neglect.

28.     This behavior including a depressed mood, disheveled/unkempt appearance, minimal participation in his classes, and refusal to complete school assignments.

29.     In May 2021, E.C. videotaped himself torturing and killing animals. One such animal was a bird.

30.     E.C. decapitated the bird and stored the head in a jar.

31.     In August of 2021, E.C. took a video of himself holding a gun.

32.     He sent the video to an Oxford High School classmate with the message: "It's time to shoot up the school! JK."[7]

33.     The gun at that time was his father's 22-caliber handgun.

34.     Defendant Hopkins became E.C.'s school counselor at Oxford High School in the fall of 2020, E.C.'s freshman year.[8]

35.     Hopkins continued to be E.C.'s assigned counselor his sophomore year of high school.

36.     Early in November 2021, Hopkins received an email from E.C.'s Spanish teacher that E.C. seemed "sad".[9]

---

[7] Transcript of Preliminary Examination, Vol. 2, *The People of the State of Michigan v. James Robert Crumbley and Jennifer Lyn Crumbley*, (Nos. 21-006651-2; 2022-279989-90-FH) at 108:7-11.
[8] Transcript of Preliminary Examination, Vol. 1, *The People of the State of Michigan v. James Robert Crumbley and Jennifer Lyn Crumbley*, (Nos. 21-006651-2; 2022-279989-90-FH) at 263:13-15
[9] *Prelim. Ex. Tr., vol. 2, at* 108:21-22.

37.     Hopkins did a check-in with E.C. and told him that he was available if E.C. needed to talk.  In response, E.C. just said, "okay".[10]

38.     Approximately four weeks before the mass shooting, a severed deer head was brought into and left at Oxford High School.

39.     The deer head occurrence caused a level of concern and anxiety amongst Oxford High School students, parents and teachers.

40.     On November 11, 2021, two weeks before the shooting, E.C. brought a severed bird's head to school in a jar and placed it in the boys' bathroom.[11]

41.     Other students found and reported the bird's head to school administrators, including Oxford High School Principal Wolf.

42.     OCSD administrators concealed this information from both staff and parents in the OCSD.

43.     A reasonable investigation would have uncovered that E.C. was the student responsible for the bird's head.

44.     An entry in E.C.'s journal confirmed that he was the person who brought the bird head to Oxford High School.[12]

45.     Cell phone records also document that he had recorded himself decapitating a bird.[13]

46.     The next day, November 12, 2021, Oxford High School administration sent an email to parents of Oxford High School students stating: "Please know that we have received every concern shared with us and investigated all information provided . . . We

---

[10] *Id.* at 109:1-7.
[11] *Id.* at 223: 8-14.
[12] *Id*. at 223:8-14.
[13] *Id*. at 264:12-13.

want our parents and students to know that there has been no threat to our building nor our students."

47.     On or about November 16, 2021, multiple parents directly informed Principal Wolf of concerns about threats to students made on social media, and concerns about multiple severed animal heads at Oxford High School.

48.     Communications from parents to Principal Wolf stated, in part:  "I know it's been investigated but my kid doesn't feel safe at school . . . He didn't even want to go back to school today."

49.     Students and parents at Oxford High School recognized the presence of a violent threat in mid-November 2021, but OCSD administrators dismissed the threat as not credible.

50.     In response to reports from parents, students, and teachers, District administrators persisted in their campaign to conceal and minimize the threat to school safety.

51.     On November 16, 2021, Principal Wolf emailed parents, stating: "I know I'm being redundant here, but there is absolutely no threat at the HS . . . large assumptions were made from a few social media posts, then the assumptions evolved into exaggerated rumors."

52.     That same day, Superintendent Throne made an announcement on the Oxford High School public address system instructing students to stop spreading rumors and relying on information on social media and reassuring students that there were no threats that posed any danger to them at Oxford High School.

53.     At all relevant times, Throne, while acting as the Superintendent of OCSD, discouraged students and parents from reporting, sharing or otherwise discussing the threatening social media posts.

54.     At all relevant times, Wolf, while acting as the Principal of Oxford High School, directed the teachers and counselors to tell students to stop reporting, sharing or otherwise discussing the threatening social media posts and violent animal slaughter that was occurring at Oxford High School.

55.     At all relevant times, Throne and Wolf's respective actions, by advising each and every student, including E.M., that there was no credible threat, demonstrated conduct so reckless as to demonstrate a substantial lack of concern for whether an injury resulted.

56.     At all relevant times, E.M. was safer before Throne and Wolf respectively took action and advised each and every student, including E.M., that there was no credible threat.  By virtue of Throne and Wolf's actions, they each substantially increased the danger and ultimate harm to E.M.

57.     At all relevant times, E.C.'s social media accounts were set to "public", allowing any person on the internet to view the contents, which primarily depicted E.C.'s obsession with and unrestricted access to firearms.

58.     Upon information and belief, the content of E.C.'s social media accounts were known to fellow students, parents and the Oxford Defendants prior to the shooting on November 30, 2021.

**C. UPON INFORMATION AND BELIEF ON NOVEMBER 26, 2021, SEVERAL DAYS BEFORE THE MASS SHOOTING, ACME UNLAWFULLY AND NEGLIGENTLY SOLD THE GUN USED IN THE SHOOTING VIA A STRAW SALE**

59.     Acme, when it chose to become a federally licensed firearms dealer ("FFL"), voluntarily assumed a duty to act as the "principal agent of federal enforcement in restricting criminals access to firearms" and to "ensure that, in the course of sales or other dispositions weapons are not obtained by individuals whose possession of them would be contrary to the public interest." *Abramski v. United States*, 573 U.S. 169, 186 (2014) (internal quotation omitted).

60.     A key aspect of Acme's duty as a gatekeeper controlling access to firearms involved carefully learning and strictly complying with all relevant state and/or federal firearms laws applicable to the sale, marketing possession and/or use of firearms.

61.     Another key aspect of this duty involved applying reasonable safeguards in addition to those required by statute to prevent firearms from being entrusted, either directly or indirectly, to individuals showing a propensity to misuse them because of age, emotional disturbance or other reasons.

62.     Such safeguards include, but are not limited to, asking screening questions such as those suggested in the "Don't Lie for the Other Guy" program supported by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and/or calling law enforcement to enable further investigation if circumstances suggest a potentially unlawful transaction.

63.     Pursuant to Acme's gatekeeper duty, Acme had an important obligation to carefully train, supervise and monitor its employees to make sure that they successfully identify and stop so-called "straw purchases."

14

64.     A "straw purchase" is one in which "a person . . .  buys a gun on someone else's behalf while falsely claiming that it is for himself.  *Abramski*, 573 U.S. at 169.

65.     Acme, since well before 2021, has been on notice that straw purchases are a primary way in which dangerous and/or legally disqualified possessors – including juveniles – gain access to firearms.

66.     In fact, the ATF, in a public report from 2000, emphasized that straw purchases were the most common source of firearms in investigations involving youth and juveniles – accounting for over half of all firearms associated with these investigations.  ATF, *Commerce in Firearms*, 22 Table 12 (Feb. 2000).

67.     Acme also knew or should have known, since well before 2021, that guns sold in actual or alleged straw sales have repeatedly been linked to violent crimes.

68.     It was foreseeable to Acme that completing a straw sale would likely arm a juvenile such as E.C. who was prone to misuse a firearm in an unlawful act of violence.

69.     A gun dealer who completes a straw sale despite actual and/or constructive knowledge that it is a straw transaction and falsely certifies such a sale as lawful on ATF Form 4473 knowingly violates, either directly and/or as an accomplice/co-conspirator, a number of state and/or federal laws applicable to the sale and/or marketing of firearms.

70.     Constructive knowledge that a party is a straw purchaser can be based on a seller's willful blindness to a collection of clear "red flags" which, in aggregate, make it clear that a straw purchase is occurring.

71.     A gun dealer knowingly violates one or more additional laws, either directly and/or as an accomplice/co-conspirator, if it completes a straw transaction despite actual

15

and/or constructive knowledge that the actual purchaser (*i.e.,* the intended user) of the firearm is a juvenile.

72.    The laws a seller knowingly violates, either directly or as an accomplice/co-conspirator, when it completes such a straw sale, include, but are not limited to:

a.    Prohibitions on making false statements in required firearms transaction records (18 U.S.C. §§ 922(a)(6), 922(m), 924(a));

b.    A requirement to run a background check on the actual purchaser of a firearm (*see* § 922(t));

c.    A requirement to keep records in compliance with regulations (§ 923(g));

d.    Prohibitions on obscuring evidence of crimes committed by a third-party (§§ 3, 4);

e.    Prohibitions on minors under 18 possessing handguns absent significant restrictions (§ 922(x); M.C.L.S § 750.234f) and a prohibition on the creation of a public nuisance (§ 600.3801).

73.    Because it is well-known that straw purchasers supply prohibited possessors and/or dangerous parties prone to misuse firearms, provision of a firearm to a straw purchaser also violates the common law prohibition on providing a dangerous instrument to a party showing a propensity to use it to cause harm.

74.    Upon information and belief, Acme knowingly violated one or more state and/or federal statues -- including some or all of the statutes listed above – and/or its duty of reasonable care, by completing a straw sale of the Sig Sauer 9 mm semi-automatic handgun ("the Acme gun") ultimately used by E.C. in the Oxford High School shooting to James Crumbley despite actual or constructive knowledge that James Crumbley was straw purchasing the Acme gun for E.C.

75.     Upon information and belief, the circumstances of the sale provided Acme with, at minimum, constructive knowledge that E.C., rather than his father was the actual purchaser of the Acme gun based on a collection of "red flags" which Acme willfully ignored.

76.     On November 26, 2021, 15-year-old E.C. accompanied his father, James Crumbley, to Acme.

77.     One of the Acme employees who assisted in the sale of the Acme gun, Cammy Back, recognized James Crumbley because he had previously purchased multiple firearms from Acme.[14]

78.     Cammy Back was the office manager at Acme on the date of the sale.[15]

79.     Cammy Back noticed that E.C. was with James Crumbley.[16]

80.     Cammy Back noticed that E.C. was a juvenile.[17]

81.     Cammy Back had never seen E.C. with James Crumbley during any of his prior firearms purchases[18].

82.     At the time of the actual sale, Cammy Back had left the counter, returned to her office and was not in position to witness or observe the interactions between James Crumbley, E.C. and the "counter guy" in the store.[19]

83.     Upon information and belief, E.C. and/or James Crumbley engaged in behavior or made one or more statements while in the store which further indicated that the Acme gun was intended for E.C.

---

[14] *Id.* at 86:25; 87:1-25; 88:1-25; 89:1-7.
[15] *Id. at 79-80.*
[16] *Id.at 86:25; 87-1-25; 88:1-25; 89:1-7.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

84.     After the sale, E.C. and/or one or both of his parents openly and publicly referred to the Acme gun as E.C.'s firearm.

85.     On the same day Acme sold the Acme gun, E.C. posted a photo of the Acme gun to his public Instagram account with the caption: "[J]ust got *my* new beauty today [heart eyes emoji] Sig Sauer 9 mm. Any questions I will answer." [emphasis added]

86.     This post was readily accessible to any person on the internet, including all Defendants.

87.     On November 27, 2021, E.C.'s mother, Jennifer Crumbley took E.C. to Accurate Firearms & Range in Clarkston, Michigan, so that E.C. could practice shooting the Acme gun.

88.     On November 27, 2021, Jennifer Crumbley posted a photo on her Facebook page of a target at the shooting range with the caption: "[M]om and son day testing out *his* new Christmas present."[20]

89.     This social media post referred to E.C. firing the Acme gun.

90.     At all relevant times, Jennifer Crumbley's social media accounts were set to "public", allowing any person on the internet to view her posts, including Defendants.

91.     The above statements are illustrative, rather than exhaustive, examples of how the Crumbleys did not believe there was a reason to hide the fact that the Acme gun was E.C.'s.

92.     Upon information and belief, had Acme adequately trained, supervised and/or monitored its employees to comply with the law and its duty of reasonable care in detecting and stopping straw purchases, Acme would not have sold the Acme gun to the

---

[20] *Prelim. Ex. Tr.,* vol. 1, at 207:4-6 (emphasis added).

Crumbleys on November 26, 2021 and E.C. would not have had access to the Acme gun on the date of the Oxford High School shooting.

93.     Instead, because Acme chose to violate its duty to detect and stop straw purchases, it armed a juvenile (E.C.) with the Acme gun he used in the unlawful violence which harmed E.M.

94.     Such a tragic consequence was a predictable result of Acme's misconduct in completing the relevant straw sale on November 26, 2021.

95.     E.M. is entitled to redress for the foreseeable injury inflicted upon him with the Acme gun as a consequence of Acme's negligent and/or unlawful misconduct.

96.     Upon information and belief, Acme has not meaningfully changed its practices to prevent negligent and/or unlawful sales to straw purchasers and/or otherwise dangerous and/or disqualified parties since the E.C.'s use of the Acme gun in the attack on Oxford High School.

97.     This suit in no way seeks to impose liability on gun sellers who act responsibly and reasonably in terms of complying with all relevant laws and common-sense safeguards when selling guns or to infringe upon the Second Amendment rights of individual citizens.

98.     Instead, it seeks only to hold Acme accountable for its *irresponsible* and *unreasonable* decision to place profit over the safety of the community by negligently and/or unlawfully selling the Acme gun in violation of one or more federal and/or state statutes and in breach of the relevant standard of care.

**D. NOVEMBER 29, 2021 - E.C. CONTINUES TO EXHIBIT WARNING SIGNS OF HIS IMPENDING VIOLENCE**

99.    The morning of November 29, 2021, Defendants Ejak and Pam Parker Fine ("Fine"), the OCSD's Restorative Practices Coordinator, received an email from E.C.'s Spanish teacher informing them that E.C. had been using his cell phone during class to access the internet to look up information about ammunition.[21]

100.    This email was forwarded to E.C.'s counselor, Defendant Hopkins.[22]

101.    Fine called E.C. to her office, where he met with Fine and Defendant Hopkins.[23]

102.    The meeting started at about 9:00 a.m. on November 29, 2021 and lasted approximately five minutes.[24]

103.    The only support or guidance that Fine and Defendant Hopkins provided to E.C. was to inform him that looking up ammunition on his cell phone during school hours was not "school appropriate behavior."[25]

104.    In response, E.C. told Fine and Hopkins that he had gone to a gun range with his mother the previous weekend to shoot guns, that shooting guns was a family hobby, and that he was researching information about his shooting hobby.[26]

105.    During the meeting, E.C. was compliant, calm, and understanding, was not argumentative or oppositional, and demonstrated an obedience to authority.[27]

---

[21] *Id*. at 135:12-22.
[22] *Id*. at 135: 16.
[23] *Id.* at 135:22-25.
[24] *Id.* at 109:22-25.
[25] *Id.* at 110:1-11.
[26] *Id*. at 110:21-24.
[27] *Id*. at 110: 1-15.

106.   At the conclusion of the meeting, Fine and Hopkins permitted E.C. to return to class.[28]

107.   After the meeting, Fine called E.C.'s mother and left a voicemail message.[29]

108.   In accordance with the OCSD policy, Fine did not ask for a return call from E.C.'s mother because the situation did not present a disciplinary issue.[30]   E.C.'s mother did not return Fine's call.

109.   Later that day, E.C.'s mother texted him: "Seriously?? Looking up bullets in school??"  E.C. responded: "Oh, yeah.  I already went to the office for that."[31]  E.C.'s mother responded: "Did you at least show them a pic of your new gun?"  E.C. responded: "No."[32]

110.   Later that same evening, E.C. posted to his public Twitter account:  "Now I am become Death, the destroyer of worlds.  See you tomorrow Oxford."

### E. NOVEMBER 30, 2021 - E.C. EXHIBITS WORSENING SUICIDAL AND HOMICIDAL IDEATIONS. DEFENDANTS EJAK AND HOPKINS ESCALATE THE IDEATIONS AND THEN DELIBERATELY CHOOSE TO RELEASE E.C. BACK INTO THE GENERAL SCHOOL POPULATION

111.   On the morning of November 30, 2021, E.C. returned to Oxford High School with his gun and 48 rounds of ammunition in his backpack. He also had a journal in his backpack that contained 21 pages of his plans for the mass shooting.[33] The journal stated in part: "First off, got my gun.  It's an SP2022 Sig Sauer 9-millimeter.  Second, the shooting is tomorrow, I have access to the gun and ammo."[34]  It also contained two

---

[28] *Id*. at 111:21-23.
[29] *Id*. at 111:13-16.
[30] *Id*. at 137:14-17.
[31] *Prelim. Ex. Tr.,* vol. 1 at 180: 17-25.
[32] *Id.* at 182: 12-18.
[33] *Prelim Ex. Tr.,* vol. 2, at 223:2-25; 224:1-20.
[34] *Id.* at 226:3-6.

separate drawings of bullets.  One drawing was labeled ".22". The other drawing was labeled "9-millimeter".  The .22 drawing has next to it "kill range, 25M, max", and the 9-millimeter drawing has next to it "kill range, 100M." There was also a large drawing of what appears to be a cup with liquid in it, a severed bird head, and what appeared to be a demon drawn next to it.[35]

112.    At approximately 8:50 a.m., Defendant Hopkins viewed an email from a teacher in the Oxford High School English Department sent at 8:30 a.m., stating that E.C. was watching a video during class on his cell phone depicting a realistic shooting.[36]

113.    At approximately 8:59 a.m., E.C.'s math class participated in a test review. On his math worksheet, E.C. drew a picture of the Acme gun.  Under the gun, he wrote: "The thoughts won't stop.  Help me." To the right, he drew a person with two gunshot wounds: one in the chest and one in the abdomen with blood coming from the mouth. Beside this, he wrote "blood everywhere" and drew a shell casing or bullet. Below, E.C. drew a laughing/crying emoji.  Finally, he wrote: "My life is useless" and "The world is dead." His teacher saw the drawing and immediately reported it to Hopkins and Ejak.

114.    This drawing and these statements were clearly violent and disturbing, were an obvious cry for help, and openly expressed E.C.'s thoughts of suicide and/or homicide.

115.    Subsequently that morning, E.C. altered his drawings on the worksheet.  He scratched out the drawings of the gun, the bloody person, and the words "Help me", "My life is useless," "The world is dead," and "Blood everywhere." E.C. added new, equally disturbing phrases in this context: "video game this is", "harmless act," "I love my life so much!!!!", "OHS rocks!", and "we're all friends here."

---

[35] *Id.* at 226:1-22.
[36] *Id.* at 112:18-22.

116.    E.C.'s math teacher reported the drawings and writing to Nicholas Ejak, Dean of Students.[37]

117.    Nicholas Ejak, Dean of Students, came to Shawn Hopkins' office around 9:00 a.m. to let Hopkins know that he had seen a picture of the writings and drawings on E.C.'s math worksheet.[38]

118.    Thereafter, Hopkins went to E.C.'s math classroom to remove E.C. for a meeting in the counseling office.[39]

119.    Hopkins took possession of the math worksheet off E.C.'s desk in the classroom and escorted him to the counseling office, where Ejak was waiting.[40]  E.C.'s backpack remained in the classroom.

120.    Ejak returned to the math classroom and retrieved E.C.'s backpack, which contained a handgun and 48 rounds of ammunition.[41]

121.    At no point did Ejak or Hopkins search E.C.'s backpack or locker to determine whether E.C. was armed and dangerous and to determine whether he had immediate access to a deadly weapon he could use to harm himself or others.

122.    During their meeting, Hopkins asked E.C. about the video of a shooting he watched in class on the morning of November 30, 2021. E.C. responded that the video he watched was of a video game, not an actual event as his teacher had described it.[42]

---

[37] *Id*. at 113:7-9.
[38] *Id*.
[39] *Id*. at 113:12-14.
[40] *Id*. at 113: 21-25.
[41] *Id*. at 150:18-25.
[42] *Id* at 115:10-25; 116:1-20

123.    Neither Hopkins nor Ejak attempted to watch the actual video to confirm the accuracy of E.C.'s representation of said video.[43]

124.    Ejak and Hopkins had actual knowledge of a safety threat and a concern for E.C.'s safety and well-being, given the events in the preceding months and days, which included searching for bullets on his phone, informing Hopkins and Fine of his shooting hobby, viewing a shooting during English class, and drawing disturbing pictures and words on his math assignment.

125.    During this meeting, Hopkins also asked E.C. about the disturbing words and images he drew on his math assignment. E.C. explained to Hopkins that the drawings depicted a video game he wanted to design.  No other explanation was given.[44]

126.    Hopkins knew that E.C. was not being truthful when E.C. dismissed the words and images as a video game design, as demonstrated by the fact that Hopkins told E.C., "this does not sound like a video game."[45]

127.    E.C. did not deny Hopkins' assertion that his drawing did not depict a video game. Rather, Hopkins observed E.C.'s demeanor visible change and, in Hopkins's words, E.C. "became sad . . . He started pushing more in his speech.  He then described some [upsetting] things that had happened recently in his life," including the death of a family dog, the death of a grandparent, and the loss of a close friend who had to leave school.[46]

128.    At this point, Hopkins determined that E.C. was suicidal.[47]

---

[43] *Id.* at 153:8-10.
[44] *Id.* at 115:10-25; 116:1-20.
[45] *Id.* at 116:18-20.
[46] *Id.* at 116:22-117:10.
[47] *Id.* at 117:14-16.

129.   Hopkins asked E.C. if he was a threat to himself or others.[48]

130.   E.C. responded, "I can see why this looks bad. I'm not going to do anything."[49]

131.   Hopkins did not accept E.C.'s response at face value.   Rather, Hopkins concluded, accurately, that E.C. was suicidal and "was a threat to himself in spite of his statement."[50]

132.   Hopkins had had three other students assigned to him at Oxford High School that year make suicide attempts.[51]

133.    Hopkins called E.C.'s mother.  However, she did not pick up.  Hopkins left a voicemail message.[52]

134.   Hopkins next called E.C.'s father.  There was no answer and no option to leave a voicemail message.[53]

135.   E.C.'s mother then returned Hopkin's call.[54]

136.   Hopkins put the call on speaker so that E.C. and Ejak could all speak with E.C.'s mother.[55]

137.   Hopkins testified that he was "concern[ed] about the student [E.C.] because it was a couple of messages in a couple days, and the purpose of the meeting was to find out what our next steps would be."[56]

---

[48] *Id.* at 118:21-23.
[49] *Id.* at 125:1-16.
[50] *Id.* at 148:4-6.
[51] *Id.* at 119:5-12.
[52] *Id.* at 120:15-2; 121:1-8.
[53] *Id.* at 123: 15-16.
[54] *Id.* at 121: 13-14.
[55] *Id.* at 121:13-18.
[56] *Id.* at 115:2-5.

138.    Hopkins asked E.C.'s mother to come to Oxford High School for a meeting.[57]

139.    E.C.'s mother told Hopkins she was at work and that she would try and get ahold of E.C.'s father.[58]

140.    E.C.'s mother called back and said she would be there in a half hour.[59]

141.    At approximately 10:30 a.m., E.C.'s mother and father arrived at the school.[60]

142.    While they waited for E.C.'s parents to arrive, Hopkins stayed with E.C. in the counseling office because he knew he was suicidal and that it was not safe to leave him alone.[61]

143.    After E.C.'s parents arrived, Hopkins texted Ejak to come back to his office for a meeting.[62]

144.    Upon their arrival, E.C.'s parents did not greet, touch or hug E.C., and they were not friendly or showing care or concern for their child.  This struck Hopkins as odd, and unlike any other meeting he had ever had with parents.[63]

145.    In the meeting with E.C. and his parents, Hopkins described why he was concerned about E.C. and his well-being, including his sharing his conclusion that E.C. was suicidal.[64]

---

[57] *Id*. at 123: 9-10.
[58] *Id*. at 123:11-13.
[59] *Id.* at 123: 20-24.
[60] *Id.* at 124: 13.
[61] *Id*. at 124: 14-21.
[62] *Id*. at 126: 4-5.
[63] *Id.* at 126:11-22.
[64] *Id.* at 127:13-17.

146.    Neither Hopkins nor Ejak questioned E.C.'s parents about his access to a gun, despite the depiction of one on his math worksheet and his suicidal presentation.

147.    Hopkins provided the family a list of resources for mental health support and stated that E.C. needed to start counseling as soon as possible, "today, if possible," or take other steps to protect their son from self-inflicted harm.[65]

148.    In response, E.C.'s mother stated that "Today is not possible. We have to return to work." [66]

149.    Hopkins had never previously had a student's parent appear at such a meeting and not take the student home as requested.[67]

150.    Hopkins then stated that he wanted E.C. seen for mental health counseling within 48 hours, that he would follow up to see if he had obtained counseling[68], and if they did not obtain counseling, he would report them to Child Protective Services ("CPS").[69] Hopkins testified he did not want E.C. to be alone, but was not confident E.C.'s parents would obtain counseling for him as instructed.[70]

151.    Ejak and Hopkins knew that the refusal of E.C.'s parents to address this emergent medical need was evidence of child abuse/neglect of the kind that needed to be reported immediately under Michigan's Child Protection Act, MCL § 722.623, *et seq.*

152.    Based on the facts and circumstances known to them at the time, Hopkins and Ejak knew that E.C. was suicidal.

---

[65] *Id.* at 128:3-10.
[66] *Id.* at 128:18.
[67] *Id.* at 129:21-25.
[68] *Id.* at 130: 3-7.
[69] Letter from Superintendent Throne to Oxford Wildcat Nation dated December 4, 2021, page 2, https://www.oxfordschools.org/for_parents__students/2021-22_district_communications/december_4__update_from_supt__throne (last accessed April 29, 2022)
[70] *Prelim Ex. Tr.,* vol. 2, at 130:11-21.

153.    Hopkins and Ejak also knew, or should have known, that E.C. had expressed homicidal ideation and that he presented a substantial risk of deadly harm to others.

154.    At the end of the meeting, E.C.'s mother then asked Hopkins and Ejak, "are we done?"[71]

155.    Hopkins looked to Ejak and asked him "if there was any disciplinary reason why [the] student could not return to class."[72]

156.    Ejak responded "no".[73]

157.    Hopkins then said, "I guess we are done."[74]

158.    The meeting between Hopkins, Ejak, E.C. and his parents lasted "[l]ess than 15 minutes."[75]

159.    Despite speaking to E.C. the day prior about his access to firearms and his shooting hobby, and now knowing E.C.'s suicidal and homicidal ideations, Hopkins and Ejak took the time to deliberate about the next course of action and still determined that E.C. could return to class.

160.    Shockingly, they also returned E.C.'s backpack to him without searching its contents.[76]

161.    Ejak and Hopkins had just cause to either inspect the contents of the backpack or, if they felt that such cause did not exist, to withhold the backpack from E.C.

---

[71] *Id.* at 132:2.
[72] *Id.* at 132:5-7.
[73] *Id.* at 132:8-9.
[74] *Id.* at 132:13-14.
[75] *Id.* at 131:5.
[76] *Id.* at 151: 20-25.

until proper authority could be provided to them to inspect the backpack themselves or have law enforcement do so.

162.    Hopkins and Ejak made the deliberate decision to return E.C. to the classroom with his unsearched backpack, despite knowing that their meeting with E.C.'s parents worsened E.C.'s emotional and psychiatric condition, knowing E.C. was obsessed with firearms and gun violence, knowing that E.C. was searching for bullets and watching shooting videos just the day before, and knowing that E.C.'s writings and drawings that morning depicted graphic gun violence and death. Their deliberate decisions shock the conscience.

163.    Hopkins and Ejak knew or should have known that threatening to call Child Protective Services within 48 hours, and threatening to remove E.C. from his home, without actually taking any action, would create and/or increase the likelihood that, if E.C. had violence in mind, he would act before he lost the opportunity.

164.    Hopkins and Ejak know or should have known that telegraphing to E.C. that there would be no meaningful disciplinary or other response to signals of violent intent would increase the risk of harm to all members of the student body, including E.M., by emboldening E.C. to believe that he could successfully complete his attack without intervention.

165.    Hopkins and Ejak knew or should have known that returning the backpack to E.C. without searching it and without inquiring as to his access to firearms would increase the risk of harm to all members of the student body, including E.M., by substantially increasing the probability that E.C. would have access to one or more firearms.

166.    Upon information and belief, Hopkins and/or Ejak engaged in other conduct which emboldened, motivated and/or otherwise influenced E.C. in a manner which made it more likely that a shooting would occur.

167.    Hopkins and Ejak knew that because E.C. was suicidal, and because the facts established probable cause to know that he posed a threat to himself and others, he should be supervised in a safe setting, and that he should not be left alone.

168.    Ejak and Hopkins had the authority as school administrators to maintain E.C. in a safe, secure and restricted environment in the counseling office, where, based on the assessment that he was suicidal, he could have been supervised by adults and would not have had access to weapons that he could use to harm himself or others.

169.    Instead, Ejak and Hopkins exercised their authority to return E.C. to class with his backpack, despite knowing that he was suicidal, and that he posed a substantial threat to himself and others.

170.    Hopkins and Ejak misused their authority by sending E.C. back through the school to his third period class, alone, and with his unsearched backpack containing his handgun and ammunition.

171.    Hopkins and Ejak deliberately conducted this meeting to the exclusion of the school safety liaison officer, thereby preventing him from being present at the meeting and taking action to prevent the tragedy that followed.

172.    Because Hopkins knew that E.C. was suicidal, he used the school's attendance reporting system to remotely track E.C. through the day and to see if he had been checked in as "present" for his third and fourth period classes.[77]

---

[77] *Prelim Ex. Tr.*, vol. 2 at 134:2-3.

173.    Hopkins and Ejak, despite knowing that E.C. was suicidal and was a threat to himself in spite of his statement to the contrary,[78] concealed those facts from E.C.'s teachers as well as the school's liaison police officer, and further concealed both the fact that E.C. should not be left alone and the threat he posed to himself and others.[79]

### F.   HOURS AFTER BEING RELEASED BACK INTO THE SCHOOL FROM THE SAFETY OF THE COUNSELING OFFICE BY HOPKINS AND EJAK, E.C. GOES ON A SHOOTING RAMPAGE, KILLING FOUR STUDENTS, AND SEVERELY INJURING SEVEN OTHERS, INCLUDING, E.M.

174.    Less than two hours after Ejak and Hopkins released E.C. from the safety and security of the counseling office, E.C. took his backpack into a bathroom and loaded his gun.

175.    E.C. first shot a student inside the bathroom, then emerged and began shooting students in the hallway.

176.    E.C. would ultimately kill four students, and seriously injure seven others, including E.M., who was shot in the face.

177.    E.M. has undergone extensive surgical care and treatment for the injuries the gunshot caused to his face, jaw and teeth.

178.    E.M. has also undergone and continues to undergo regular mental health counseling for post-traumatic stress disorder as a result of this traumatic event.

179.    At approximately 12:52 p.m., the authorities were notified of an active shooter at Oxford High School.

180.    Upon information and belief, E.C.'s shooting rampage was halted when he was apprehended by law enforcement.

---

[78] *Id.* at 148:4-6.
[79] *Id.* at 158:19-22.

181.   On December 1, 2021, E.C. was arraigned and charged as an adult with one count of terrorism causing death, four counts of first-degree murder, seven counts of assault with intent to murder, and twelve counts of possession of a firearm in the commission of a felony.

182.   The environment before Hopkins and Ejak exercised their authority to release E.C. to the classroom maintained the status quo of a safe environment  because E.C. was securely restricted to the counseling office, under the direct supervision of school administrators, and he did not have access to the weapon and ammunition in his backpack.  Hopkins and Ejak had the official authority to act as "gatekeepers" in deciding whether to release E.C. from the counseling office and return him to the classroom with his backpack.

183.   Hopkins and Ejak used their authority to return E.C. to the classroom, causing a departure from the status quo, and thus creating and/or exacerbating a risk of violence that had not existed or was lower when E.C. was safely secured in the counseling office.

184.   These affirmative acts by Hopkins and Ejak, which departed from the status quo of safety, rendered the occupants of Oxford High School, including E.M., more vulnerable to danger than had Hopkins and Ejak not returned E.C. from the confines of the counseling office to the classroom.

185.   Moreover, the meetings conducted by Hopkins and Ejak on the morning of November 30, 2021 worsened the situation and affirmatively increased and accelerated the danger of harm at Oxford High School.

186.   The meetings themselves worsened the situation and were a contributing cause-in-fact of the shooting because the meetings placed direct pressure on E.C., who was obviously in a state of suicidal and homicidal ideation, and experiencing a mental health crisis.

187.   Furthermore, the meetings directly subjected E.C. to the shame, fear, humiliation, and embarrassment of having his parents ignore, ridicule, and embarrass him in the presence of Hopkins and Ejak, thus increasing the risk of violence upon his release from the counseling office to the school environment.  The decision by Ejak and Hopkins to conduct the meeting with E.C.'s parents in front of E.C. was inappropriate and certain to exacerbate E.C.'s feelings of distress and anger.

188.   Hopkins and Ejak's actions in threatening to call CPS in E.C.'s presence, and thereby threatening to remove E.C. from his home, exacerbated E.C.'s distress and mistreatment by his parents, and therefore created and increased the danger that E.C. would act on his violent ideation after they released him from the counseling office to the school environment.

189.   Upon information and belief, Hopkins and/or Ejak engaged in other conduct which emboldened, motivated and/or otherwise influenced E.C. in a manner which made it more likely that a shooting would occur.

190.   The affirmative action of Hopkins and Ejak to return the unsearched backpack containing the firearm and ammunition to E.C. and release him into the school placed the students and staff of Oxford High School directly in harm's way and provided E.C. with the weapon and ammunition he used to commit the deadly shooting.

191.   By giving E.C. the unsearched backpack containing the gun and ammunition, and releasing him from the confines of the counseling office and returning him to the classroom and the general school population, Hopkins and Ejak affirmatively set into motion the sequence of events that lead to the shooting that ensued, with deliberate indifference to the substantial and obvious threat of a school shooting, and with recklessness demonstrating deliberate indifference and a substantial lack of concern for whether an injury resulted, either to E.C. or to the students and staff of Oxford High School.

192.   Hopkins and Ejak affirmatively concealed information by not informing either E.C.'s teachers or the school safety liaison officer of the situation, including the fact that E.C. was suicidal, thereby creating and increasing the danger of a violent incident occurring.

193.   It is shocking to the conscience that Hopkins and Ejak would take these actions despite their knowledge that E.C. was suicidal and that he was expressing specific violent ideations about gun violence.

194.   By reason of the knowledge that the Oxford Defendants possessed before the shootings began on November 30, 2021, it was foreseeable by said Defendants that E.C. would carry out acts of violence on E.M. and others at Oxford High School.

195.   The Defendants' affirmative actions were reckless, grossly negligent, shocked the conscience and put E.M., and others, at substantial risk of serious and immediate harm.

196.   The severe and grievous injuries to E.M. were caused by the wrongful affirmative acts and fault of the Defendants being sued for damages.

197.    The Defendants knew that their actions would endanger the lives of Oxford High School students and other's at Oxford High School on November 30, 2021.

**G. THE OCSD AND ITS ADMINISTRATORS HAVE BEEN ENGAGED IN A CONCERTED EFFORT TO DEFLECT THEIR RESPONSIBILITY FOR THE OXFORD HIGH SCHOOL SHOOTING.**

198.    Defendant OCSD and its administrators adopted, implemented and followed an unconstitutional policy that resulted in the release of E.C. from the safety and security of the counseling office, where he was safely supervised and where his movement and actions were restricted, and returned him to class, despite knowing the he was in the throes of a mental health crisis, obsessed with guns and gun violence, had access to firearms and was determined to be a threat to himself and others.

199.    Specifically, the OCSD has sought to avoid accountability by claiming it has a formal policy and practice of returning students to class unless there is a "disciplinary" issue that can be used to either send them home or hold them in the counseling office, and since E.C. did not present a "disciplinary" issue, it had no choice but to return him to class.

200.    This policy of using false justifications demonstrates egregious deliberate indifference to the danger presented when a student such as E.C., who the school knew was suicidal and presented a clear threat, is returned to the school environment.

201.    The unconstitutional policy relied upon by The Oxford Defendants directly resulted in the harm to E.M. and is the basis for direct liability against OCSD..

202.    On December 2, 2021, Superintendent Throne issued a video message which suggested that E.C. had contact with the "front office" before the attack but could not be detained because discipline wasn't warranted. Throne said, "I want you to know there's been a lot of talk about the student who was apprehended. That he was called up

to office and all that kind of stuff. No discipline was warranted.  There are no discipline records [for E.C.] at the High School.  Yes, this student did have contact with our front office.  And yes, his parents were on campus on November 30."[80]

203.    This statement was deliberately misleading because of what it doesn't say.

204.    Superintendent Throne knew that on the morning of the shooting, E.C. was deemed to be suicidal and then released from the safety and security of the counseling office, where he was safely supervised and where his movements and actions were restricted.  Superintendent Throne knew that OCSD staff sent E.C. back to class, despite knowing that he was in the throes of a mental health crisis, obsessed with guns and gun violence, had access to firearms and was determined by OCSD staff to be a threat to himself and others.

205.    In fact, in order to protect the bodily integrity of the student body as a whole, and E.M. in particular, the OCSD policy should have required the detention and removal from the student body of any student who was deemed to be in a mental health crisis, suicidal, fixated on guns or weapons or in any way posed a threat to the students and staff of Oxford High School.

206.    The policy should have required that in the event OCSD officials determined or believed that a student might pose a threat to himself or others, an investigation should have been conducted to determine whether the student had access to a gun or other weapon that could be used to harm that student or others.

---

[80] Tim Throne, *Superintendent of Oxford Community Schools, December 2, 2021 Message to Oxford Community*, ABC12 (December 2, 2021), https://www.abc12.com/tim-throne-superintendent-of-oxford-community-schools-december-2-2021-message-to-oxford-community/video_8b3c9912-5436-11ec-a344-5f875adc8e6e.html (last visited April 29, 2022).

207.    Further, the OCSD policy should have required that under these circumstances, the student resources police officer liaison be contacted and brought into the situation.

208.    Discovery may reveal additional aspects of the policy that needed to be reformed or that needed to be added to the policy.

209.    On December 4, 2021, Superintendent Throne wrote a letter to the parents of Oxford High School students.

210.    At this point, the narrative became completely contrived.  In describing the events of the morning of November 30, when E.C. was in counselor Hopkin's office, the Superintendent stated that at "no time did the counselors believe the student might harm others based on his behavior, responses and demeanor, which appeared calm."

211.    The Superintendent, at the time he made this statement, knew it was false.

212.    The Superintendent went on to say in the letter that "[w]hile both of his parents were present, counselors asked specific probing questions regarding the potential for self-harm or harm to others. His answers, which were affirmed by his parents during the interview, led counselors to again conclude he did not intend on committing either self-harm or harm to others.  The student's parents never advised the school district that he had direct access to a firearm or that they had recently purchased a firearm for him."[81]

213.    Again, the above assertion was false because Hopkins did, in fact, determine that E.C. was suicidal and Hopkins was fully aware that E.C. was experiencing

---

[81] Letter from Superintendent Throne to Oxford Wildcat Nation dated December 4, 2021, page 2, https://www.oxfordschools.org/for_parents___students/2021-22_district_communications/december_4__update_from_supt__throne (last accessed April 29, 2022)

a mental health crisis, was obsessed with guns and gun violence, had access to firearms, had verbalized a desire to harm others and wanted the parents to remove E.C. from school and take him for counseling that day.  When the Superintendent made these assertions, he knew they were false.

214.   On page one of the December 4, 2021 letter, the Superintendent states that he "asked for a third-party investigation be conducted so we leave no stone unturned, including any and all interaction the student had with staff and students."  At the end of the letter, the Superintendent wrote, "Again I have personally asked for a third-party review of all the events of the past week because our community and our families deserve a full, transparent accounting of what occurred."[82]

215.   The OCSD has not fulfilled this pledge to the students, parents and the Oxford Community.

### CAUSES OF ACTION AGAINST OXFORD DEFENDANTS

### COUNT I
### State-Created Danger – *Monell* Liability under 42 U.S.C. § 1983
### (Defendant Oxford Community School District)

216.   Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

217.   Defendant OCSD and its administrators and policy makers, including Superintendent Throne, Principal Wolf, and Dean of Students Ejak, adopted and maintained official policies, practices, and customs that were the moving force behind, and cause-in-fact of, the school shooting and the severe and grievous injuries to E.M. on

---

[82] *Id.*

November 30, 2021. These official policies, practices, and customs included and are not limited to:

a.  An official policy, practice, and custom of preventing staff and administrators from maintaining administrative supervision over students in the counseling office, and restricting students from returning to the classroom, unless there is a "disciplinary issue" to justify doing so;

b.  A policy, practice, or custom of concealment, misrepresentation, minimizing or avoidance and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

c.  The OCSD did not train Hopkins and Ejak to secure or hold a student in the counseling office, or to otherwise restrict a student from returning to the classroom, where the student is suicidal, where the student presents a threat of harm to themselves or others, and where returning the suicidal student to the classroom environment would create or increase the danger of deadly violence;

d.  A policy, practice, and custom of not training staff or administrators in the proper manner of interviewing and questioning a student who is known to be suicidal, including and not limited to questions about whether the student has a deadly weapon, including a firearm, and whether the student has access to a deadly weapon, including a firearm;

e.  A policy, practice, and custom of not training staff or administrators in the proper methods for completing a risk assessment;

f.  A policy, practice, and custom of not training staff or administrators to search the locker and backpack of students who present an objective risk of danger to themselves or others in the building;

g.  Disregarding and diverting student mental health crises if they do not fit within the OCSD's definition of a "disciplinary issue";

h.  Declining to file mandatory reports of suspected child abuse or neglect in violation of MCL § 722.623(a);

i.  Discouraging teachers, counselors, and administrators from reporting suspected child abuse or neglect, despite their status as mandatory reporters;

j.     Requiring additional and unnecessary procedures in order to approve a teacher, counselor, or administrator's request to file a report of suspected child abuse or neglect, or to contact law enforcement regarding a threat of violence at school;

k.     Adopting and maintaining inadequate and improper search policies; and

l.     Any other policy, practice, or custom that may become known through the course of this litigation.

218.   These policies, practices and customs caused employees to inflict constitutional harms by directly starting the sequence of events that led to the shooting and injury to E.M. on November 30, 2021.

219.   As the direct and proximate result of the OCSD policies, practices and customs which caused OCSD employees to inflict constitutional harms by directly allowing E.C.'s violence to occur, E.M. suffered terror, shock, excruciating pain, suffering, fear, trauma, severe emotional distress, scarring and disfigurement, loss of earnings capacity, and will incur future damages and the need for extensive medical care, including dental care, surgical care, and mental health counseling.

**COUNT II**
**State-Created Danger – Deliberate Indifference – 42 U.S.C. § 1983**
***(Defendants Ejak and Hopkins)***

220.   Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

221.   Minor Plaintiff E.M. is a citizen of the United States and is entitled to the rights, privileges, and immunities accorded to all citizens of the State of Michigan and the United States, including the clearly established right to be free from danger created and/or increased by individual Defendants Ejak and Hopkins.

40

222.    Any reasonable person would be aware of this clearly established constitutional right.

223.    Ejak and Hopkins, with knowledge of this clearly established right, and acting in deliberate indifference, violated E.M.'s right to be free from violence without due process, as secured by the Fourteenth Amendment's Due Process Clause, by taking affirmative acts under color of law to disrupt the status quo and create a danger of severe injury that did not exist in the status quo prior to those affirmative state actions, and by taking affirmative acts which caused severe injuries to E.M., which would not have happened but-for-those affirmative state actions.

224.    At all relevant times, Defendants Ejak and Hopkins were acting under the color of state law as employees of OCSD, a public school district, including and not limited to securing, supervising, advising, and directing the activities of E.C.; taking actions and making decisions regarding school practices and procedures, both formal and informal; and in their conduct as school administrators and counselors.

225.    Defendants Ejak and Hopkins knew that E.C. was suicidal, that he was in extreme emotional distress; that he presented a substantial risk of danger to himself and likely others at the school; that he was urgently requesting help from school staff; that there was sufficient cause to believe his parents abused and/or neglected him; and that he expressed specific violent intentions involving the use of a firearm.

226.    Ejak and Hopkins had the authority and obligation as school administrators to maintain the status quo, in which E.C. was safe, secure and restricted in the counseling office on November 30, 2021, and where he was supervised by adults and did not have access to weapons that he could use to harm himself or others.

41

227.   Ejak and Hopkins had the authority to maintain E.C. in a safe and secure location under the watchful eye of a responsible adult until such time as he was no longer a threat to himself or his fellow students.

228.   Ejak and Hopkins affirmatively misused their authority by releasing E.C. from the counseling office and returning him to class the morning of November 30, 2021, despite knowing that E.C. was suicidal, and that he posed a substantial threat to himself and others in the high school.

229.   Ejak and Hopkins each took affirmative actions that individually, or in concert with one another, created and substantially increased the danger that E.C.'s conduct would escalate to actual violence, thus causing severe and grievous injuries to E.M.

230.   Ejak and Hopkins took affirmative acts on November 30, 2021 that created or increased the risk of danger, including but not limited to:

   a.   Releasing E.C. from the safe and secure confines of the counseling office to the general school population, despite knowing that E.C. was suicidal and despite knowing, or having probable cause to know, that he was a threat to himself and others;

   b.   Returning the unsearched backpack containing his gun and ammunition to E.C., despite knowing that E.C. was suicidal and despite knowing, or having probable cause to know, the he was a threat to himself and others;

   c.   Confronting E.C. in front of his parents about the events of November 30, 2021 and advising him that he needed to obtain immediate mental health therapy or they would call CPS and remove him from his home, thus creating an urgency in E.C. to carry out his homicidal plan;

   d.   Promoting a policy, practice, or custom of concealment, misrepresentation, minimizing or avoidance and non-escalation of suspected or known risks of school violence; and

e. Any and all additional affirmative acts that created or increased the danger of violence at the school that may become known throughout the course of this litigation.

231. Ejak and Hopkin's affirmative acts created and exacerbated a state-created danger that substantially increased the special danger of harm to E.M. and his classmates at the school, and in doing so knowingly and recklessly disregarded the substantial risk of danger that E.C. posed to himself and others.

232. The relationship between Ejak and Hopkins, as school administrators, and the students of Oxford High School, including E.M., was such that Ejak and Hopkins knew that E.M. was a foreseeable victim of E.C.'s acts of violence following his release from the security of the counseling office by Ejak and Hopkins.

233. Ejak and Hopkins are not entitled to qualified immunity because Plaintiff's right not to be severely injured and shot by a fellow student who was released from a safe environment into one in which harm was likely to occur was clearly established at the time of Ejak's and Hopkin's actions.

234. The conduct of Defendants Ejak and Hopkins was objectively unreasonable and performed knowingly, deliberately and with deliberate indifference to the safety of E.M. and his fellow students, causing Oxford High School students and staff to be less safe than they were before Defendants' affirmative actions.

235. Ejak and Hopkins knew that their conduct, which exacerbated the risk and ultimately caused a school shooting, violated the clearly established rights of the students at Oxford High School.

236. Ejak and Hopkins had ample time to deliberate and make an unhurried judgment about whether to release E.C. from the safety and security of the counseling office to the general school population.

237.    Ejak and Hopkins consciously disregarded a substantial risk of serious harm by releasing E.C. from the safety and security of the counseling office to the general school population.

238.    But for the affirmative acts of Ejak and Hopkins to change the status quo by permitting E.C. to leave the counseling office with the backpack containing his handgun and ammunition, E.C. would not have shot, injured or killed anyone at Oxford High School, including E.M., on November, 30, 2021.

239.    But for Ejak's and Hopkin's actions of releasing E.C. into the general school population with the backpack containing his handgun and ammunition, the status quo-safety – would have remained.

240.    Ejak's and Hopkin's actions affirmatively created new dangers that did not exist as long as E.C. remained in the counseling office, separated from his backpack, and affirmatively increased dangers that did not exist as long as the status quo was preserved.

241.    It is shocking to the conscience that Ejak and Hopkins would release E.C. from the security of the counseling office and return him to the classroom, where they knew that E.C. was suicidal, they knew that E.C. had an obsession with guns and gun violence, they knew that E.C. had been researching bullets at school and informed Hopkins that he enjoyed shooting guns, they knew that E.C. had been watching a video of a shooting in his first period class, they knew that in his second period class E.C. had drawn disturbing and violent words and images onto a math worksheet, including: "The thoughts won't stop.  Help me . . . blood everywhere . . . My life is useless . . . The world is dead;" they knew that E.C.'s parents were informed of his suicidal ideation and abandoned him at school, they knew that E.C. was a threat to himself and others, even

after he denied that he was a threat when Hopkins posed that direct question to E.C., and they knew that they had an obligation to keep E.C. away from the classroom environment even if the circumstances did not present a "disciplinary issue."

242.   In comparison with the public-at-large, as students at Oxford High School, E.M. and other victims of the shooting were specifically at risk and exposed to the dangers presented by the act of releasing E.C. from the safety of the counseling office to the school environment, where he committed the shooting.

243.   As the direct and proximate result of Ejak's and Hopkins's deliberate indifference, E.M. suffered terror, shock, excruciating pain, suffering, fear, trauma, severe emotional distress, scarring and disfigurement, loss of earnings capacity, and will incur future damages and the need for extensive medical care, including dental care, surgical care, and mental health counseling.

**COUNT III**
**State-Created Danger – Deliberate Indifference – 42 U.S.C. § 1983**
*(Defendants Throne and Wolf)*

244.   Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

245.   Minor Plaintiff E.M. is a citizen of the United States entitled to all rights, privileges, and immunities accorded to all citizens of the State of Michigan and the United States, including the clearly established right to be free from danger created and/or increased by Superintendent Throne and Principal Wolf under the Fourteenth Amendment to the United States Constitution, as enforced pursuant to 42 U.S.C. § 1983.

246.   Any reasonable person would be aware of this clearly established constitutional right.

247.   Throne and Wolf, with knowledge of this clearly established right, and acting with deliberate indifference, violated E.M.'s right to be free from violence without due process, as secured by the Fourteenth Amendment's Due Process Clause, by taking affirmative acts under color of law to create a danger of severe injury by taking affirmative acts which caused severe injuries to E.M., which would not have happened but-for-those affirmative state actions.

248.   At all relevant times, Defendants Throne and Wolf were acting under the color of state law as employees of OCSD, a public school district, including and not limited to maintaining school safety, investigating violent behavior in the District, investigating threats of violence directed at the OCSD; taking action and making decisions regarding school practices and procedures, both formal and informal; and by their conduct as school administrators.

249.   Defendants Throne and Wolf knew that there were active threats of violence that compromised student safety at the Oxford High School in the weeks and months leading up to the November 30, 2021 shooting, and that those threats had not been formally or fully investigated.

250.   Throne and Wolf had the authority and obligation as school administrators to maintain school safety and to fully and completely investigate all violence in their District and all threats to the safety of the District's students, including investigating who had left the severed animal heads in Oxford High School.

251.   Throne and Wolf each took affirmative actions that individually, or in concert with one another, created and substantially increased the danger that E.C.'s conduct would escalate to actual violence, thus causing severe and grievous injuries to E.M.

252.     The affirmative actions and conduct of Throne and Wolf in the weeks leading up to the November 30, 2021 shooting, which created and/or increased the risk of harm to E.M. in reckless disregard for his safety, non-exhaustively include:

a.     Deliberately and intentionally concealing facts from appropriate law enforcement as to the severed bird head EC placed in the boys' bathroom just weeks before the shooting;

b.     Deliberately and intentionally concealing facts from the Oxford High School students and parents of ongoing violence at the school, and instead falsely assuring them that there were no threats to school safety that they should be concerned with in the days and weeks leading up to the November 30, 2021 shooting;

c.     Deliberately discouraging Oxford High School students from taking seriously the threats they had perceived to their safety; and instructing them to stop talking about or sharing the threatening information they find on social media;

d.     Promoting a policy, practice, or custom of misrepresentation, minimizing or avoidance and non-escalation of suspected or known risks of school violence; and

e.     Any and all additional breaches that created or increased the danger of violence at the school that may become known through the course of this litigation.

253.     The foregoing non-exhaustively described actions and conduct of the individual government Defendants was a proximate cause of the minor Plaintiff's injuries.

254.     At all relevant times, Throne and Wolf's respective actions, by advising each and every student, including E.M., that there was no credible threat, demonstrated conduct so reckless as to demonstrate a substantial lack of concern for whether an injury resulted.

255.     At all relevant times, E.M. was safer before Throne and Wolf respectively took action and advised each and every student, including E.M., that there was no

credible threat.  By virtue of Throne and Wolf's actions, they each substantially increased the harm to E.M.

256.    Had Throne and Wolf conducted a reasonable investigation into the threats of violence made towards Oxford High School and its students, including the decapitated bird head left in the boys' bathroom, they would have found that E.C. was the perpetrator of those threats and the person that severed the bird's head, as such information was readily accessible on his public social media pages. Thereafter, E.C. would have been removed from school, and the mass shooting on November 30, 2021, would never have occurred and E.M. would not have sustained the severe and grievous injuries he did that day.

257.    Throne's and Wolf's affirmative acts created a state-created danger that substantially increased the special danger of harm to E.M. and other students at Oxford High School, as distinguished from a risk that affects the public at large.

258.    The conduct of Throne and Wolf was objectively unreasonable and performed knowingly, deliberately, and with deliberate indifference to the safety of E.M., causing all Oxford High School students and staff to be less safe than they were before their affirmative actions.

259.    But for the affirmative acts of Throne and Wolf, E.C. would not have shot, injured, or killed anyone at Oxford High School, including E.M., on November 30, 2021.

260.    It is shocking to the conscience that Throne and Wolf would not only decide not to report the bird head incident to law enforcement or investigate the active threats being made towards Oxford High School, but rather affirmatively provide a knowing false

sense of security to the parents and students of Oxford High School, and even more shockingly tell the students that they were not to talk about the threats on social media.

261.    The students of Oxford High School, including E.M., were specifically at risk of the dangers presented by the Throne and Wolf's affirmative acts

262.    In comparison with the public-at-large, as students at Oxford High School, E.M. and other victims of the shooting were specifically at risk and exposed to the dangers presented by the act of allowing E.C. to matriculate through the school environment.

263.    As the direct and proximate result of Throne's and Wolf's deliberate indifference, E.M. suffered terror, shock, excruciating pain, suffering, fear, trauma, severe emotional distress, scarring and disfigurement, loss of earnings capacity, and will incur future damages and the need for extensive medical care, including dental care, surgical care, and mental health counseling.

**COUNT IV**
**Violation of Article 1, §17 of the Michigan Constitution-Substantive Due Process – Bodily Integrity**
*(Ejak and Hopkins)*

264.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

265.    The Due Process Clause of the Michigan Constitution provides, in pertinent part, that "[n]o person shall…be deprived of life, liberty or property, without due process of law . . . " Const 1963, art 1, § 17.

266.    The due process guarantee of the Michigan Constitution is coextensive with its federal counterpart.  The doctrine of substantive due process protects enumerated fundamental rights and liberties under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and under Const 1963, art 1, § 17.

267.   The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable government interference.

268.   In a long line of cases, courts have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the right to bodily integrity.

269.   Plaintiffs enjoy the constitutionally protected Due Process right to be free from the invasion of bodily integrity through assault and battery under the Due Process Clause.

270.   The violation of the right to bodily integrity involves an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective.

271.   The United States Supreme Court and the Michigan appellate courts have recognized that no right is held more sacred, or is more carefully guarded, than the right of every individual to the possession and control of his or her own person, free from all interference of others, unless by clear and unquestionable authority of law.

272.   Any reasonable person would be aware of this clearly established right to bodily integrity.

273.   Ejak and Hopkins, with knowledge of this clearly established right, and acting in deliberate indifference, violated E.M.'s right to bodily integrity and to be free from violence without due process, as secured by the Fourteenth Amendment's Due Process Clause, by taking affirmative acts under color of law to disrupt the status quo and create a danger of severe injury that did not exist in the status quo prior to those affirmative state

actions, and by taking affirmative acts which caused severe injuries to E.M., which would not have happened but-for-those affirmative state actions.

274.    At all relevant times, Defendants Ejak and Hopkins were acting under the color of state law as employees of OCSD, a public school district, including and not limited to securing, supervising, advising, and directing the activities of E.C.; taking actions and making decisions regarding school practices and procedures, both formal and informal; and in their conduct as school administrators and counselors.

275.    Defendants Ejak and Hopkins knew that E.C. was suicidal, that he was in extreme emotional distress; that he presented a substantial risk of danger to himself and others at the school; the he was urgently requesting help from school staff; that there was sufficient cause to believe his parents abused and/or neglected him; and that he expressed specific violent intentions involving the use of a firearm.

276.    Ejak and Hopkins had the authority and obligation as school administrators to maintain the status quo, in which E.C. was safe, secure and restricted in the counseling office on November 30, 2021, and where he was supervised by adults and did not have unfettered access to weapons that he could use to harm himself or others.

277.    Ejak and Hopkins had the authority to maintain E.C. in a safe and secure location under the watchful eye of a responsible adult until such time as he was no longer a threat to himself or his fellow students.

278.    Ejak and Hopkins affirmatively misused their authority by releasing E.C. from the counseling office and returning him to class the morning of November 30, 2021, despite knowing that E.C. was suicidal, and that he posed a substantial threat to himself and others in the high school.

279.   Ejak and Hopkins each took affirmative actions that individually, or in concert with one another, created the danger that E.C.'s conduct would escalate to actual violence, thus causing severe and grievous injuries to E.M.

280.   Ejak and Hopkins took affirmative acts on November 30, 2021 that created the risk of danger to E.M. and other students at Oxford High School, including but not limited to:

   a.   Releasing E.C. from the safe and secure confines of the counseling office to the general school population, despite knowing that E.C. was suicidal and despite knowing, or having probable cause to know, that he was a threat to the bodily integrity of himself and others;

   b.   Returning the unsearched backpack containing his gun and ammunition to E.C., despite knowing that E.C. was suicidal and despite knowing, or having probable cause to know, the he was a threat to the bodily integrity of himself and others;

   c.   Returning E.C. to the general school population with his unsearched backpack after worsening E.C.'s mental health crisis (by threatening to call CPS in E.C.'s presence and thereby threatening to remove E.C. from his home) and affirmatively increasing and accelerating the danger of harm and bodily integrity to E.C. and other students;

   d.   Any and all additional affirmative acts of deliberate indifference that would shock the conscience and create and/or increase the risk of danger of violence at the school that may become known throughout the course of this litigation.

281.   Ejak and Hopkin's deliberate indifference to E.C.'s suicidal and homicidal ideations and their decision, after ample deliberation, to return E.C. to the general school population without even searching his backpack, shocks the conscience and directly and proximately resulted in the assault on E.M., and the severe and grievous injuries sustained by the other students at Oxford High School on November 30, 2021.

282.   The relationship between Ejak and Hopkins, as school administrators, and the students of Oxford High School, including E.M., was such that Ejak and Hopkins knew that E.M. was a foreseeable victim of E.C.'s acts of violence following his release from the security of the counseling office by Ejak and Hopkins.

283.   Ejak and Hopkins are not entitled to qualified immunity because they clearly released E.C. from a safe environment into one in which harm and violation of E.M.'s Constitutional right of bodily integrity was foreseeable and likely to occur as a result of Ejak's and Hopkin's deliberate indifference.

284.   The affirmative actions of Defendants Ejak and Hopkins shock the conscience and were performed knowingly and with deliberate indifference to the safety of E.M. and his fellow students.

285.   Ejak and Hopkins knew that their conduct violated the clearly established rights of the students at Oxford High School, including E.M.

286.   Ejak and Hopkins had ample time to deliberate and make an unhurried judgment about whether to release E.C. from the safety and security of the counseling office to the general school population.

287.   Ejak and Hopkins had ample time to deliberate and make an unhurried judgment about whether to search E.C.'s backpack before returning him to the general school population, and despite their awareness of E.C.'s acute mental health crisis and suicidal and/or homicidal ideations chose to send him back into the general school population.

288.   To make matters worse, Ejak and Hopkins intentionally concealed E.C.'s mental health crisis, suicidal and homicidal ideations from his teachers and other

administrators in the school after releasing him from the counseling office that morning, as such they had no idea that they were at risk of serious and grievous injuries and could take no action to protect themselves or others in the building.

289.    But for the affirmative acts of Ejak and Hopkins to change the status quo by permitting E.C. to leave the counseling office with the unsearched backpack containing his handgun and ammunition, E.C. would not have shot, injured or killed anyone at Oxford High School, including E.M., on November, 30, 2021.

290.    But for Ejak's and Hopkin's actions of releasing E.C. into the general school population with the backpack containing his handgun and ammunition, the status quo-safety – would have remained. Because of their deliberate indifference, their actions created the crisis and mayhem that would ensue just a short time later.

291.    It is shocking to the conscience that Ejak and Hopkins would release E.C. from the security of the counseling office and return him to the classroom, where they knew that E.C. had suicidal and homicidal ideations, they knew that E.C. had an obsession with guns and gun violence, they knew that E.C. had been researching bullets at school and informed Hopkins that he enjoyed shooting guns, they knew that E.C. had been watching a video of a shooting in his first period class, they knew that in his second period class E.C. had drawn disturbing and violent words and images onto a math worksheet, including: "The thoughts won't stop.  Help me . . . blood everywhere . . . My life is useless . . . The world is dead;" they knew that E.C.'s parents were informed of his suicidal ideation and abandoned him at school, they knew that E.C. was a threat to himself and others, even after he denied that he was a threat when Hopkins posed that direct

question to E.C., and they knew that they had an obligation to keep E.C. away from the classroom environment even if the circumstances did not present a "disciplinary issue."

292. Defendant Ejak's and Hopkin's deliberate indifference resulted in a nonconsensual entry of a bullet into Plaintiff's body in violation of the Michigan Constitution 1963, art 1, § 17.

293. As the direct and proximate result of Ejak's and Hopkins's deliberate indifference, E.M.'s Constitutional right to bodily integrity was violated and he suffered terror, shock, excruciating pain, suffering, fear, trauma, severe emotional distress, scarring and disfigurement, loss of earnings capacity, and will incur future damages and the need for extensive medical care, including dental care, surgical care, and mental health counseling.

## COUNT V
### Gross Negligence
### (*Oxford Defendants*)

294. Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

295. "Gross negligence" means a duty and breach of that duty by conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results, causing injury. MCL § 691.1407(2).

296. Oxford Defendants had a duty to refrain from taking actions that were so reckless as to demonstrate a substantial lack of concern for whether an injury results, thereby causing injury.

297. In deliberate breach of this duty, Defendants Throne and Wolf concealed, minimized, and downplayed the known risk of harm inside of Oxford High School, and

affirmatively discouraged students, parents, teachers, and administrators from reporting or taking action to alleviate the risk of deadly violence at the school.

298.    Defendants Hopkins, Ejak Wolf, and Throne were aware of multiple "red flags" alerting them to the danger that E.C. presented in the school, and E.C. himself cried out for help on multiple occasions, including in writing on November 30, 2021 before the shootings, yet, in deliberate breach of their duty, Defendants Hopkins, Ejak, Wolf and Throne failed to intervene on any of the multiple occasions when doing so would have allowed E.C. to obtain the help that he needed and prevented the shooting that occurred on November 30, 2021.

299.    In deliberate breach of their duties, Defendants Hopkins and Ejak released E.C. from the safety and security of the counseling office after they determined that he was suicidal, and without taking any precautions, including searching his backpack and locker, or informing his teachers of his suicidal state, thus placing E.M. and the other victims directly in harm's way.

300.    In breach of their duties, Defendants Hopkins and Ejak deliberated and decided not to immediately contact Child Protective Services about E.C. and his parents, and instead allowed E.C., in his suicidal and homicidal state, to return to the school environment with his unsearched backpack containing his gun and ammunition, thus placing E.M. and the other victims directly in harm's way.

301.    All of these breaches of duty were so reckless as to demonstrate a substantial lack of concern for whether an injury would result, and these breaches were the cause of the shooting itself.

302.    When a child such as E.C. is known to his counselor and Dean of Students to be suicidal, and expresses repeated cries for help at school to his teachers and counselors regarding acute psychiatric distress and violent ideation related to firearms, as well as indicators of child abuse and neglect, it is entirely foreseeable that disregarding the child's requests for help and returning the child to the general student population, while choosing to forego psychiatric support and declining to conduct a search to confirm whether he was armed, is extremely likely to result in a school shooting.

303.    The Oxford Defendants breached their duty of care because, despite having actual knowledge that E.C. was suicidal, that he presented a threat to himself and others, the he had access to a gun and shot guns as a hobby, the he had been searching for bullets online during school in the past 24 hours, that on the morning of November 30 he had been watching a video of a shooting (to the point that his English teacher raised the issue to school administration), neither Hopkins nor Ejak searched E.C.'s backpack or locker, even though searching the backpack and locker was absolutely necessary, under all of the surrounding circumstances, to ensure that E.C. was not armed and dangerous and to determine whether he had immediate access to a deadly weapon he could use to harm himself or others.

304.    The Oxford Defendants' actions – including and not limited to their inadequate and dangerous policies and practices, their affirmative decisions to exclude Child Protective Services and law enforcement, their repeated decisions to keep E.C. in school and in class, even after determining he was suicidal, and the final deadly decision to return the backpack to E.C. after choosing not to conduct a search – was so reckless

as to demonstrate a substantial lack of concern for whether an injury would result, and therefore breached their duty of care.

305.    The Oxford Defendants' acts and omissions were grossly negligent, and were the proximate cause of E.M.'s injuries because the Oxford Defendants' acts and omissions directly placed the shooting victims in harm's way, provided E.C. with access to the weapon he used to shoot E.M. in the face, and to kill and injure others, and caused E.C. to escalate his behavior from violent ideation to violent conduct.

306.    As the direct and proximate result of the Oxford Defendants' actions, E.M. suffered terror, shock, excruciating pain, suffering, fear, trauma, severe emotional distress, scarring and disfigurement, loss of earnings capacity, and will incur future damages and the need for extensive medical care, including dental care, surgical care, and mental health counseling.

**COUNT VI**
**Prospective Equitable and Injunctive Relief**
**14th Amendment Due Process and 42 U.S.C. § 1983**
**(*Defendant Weaver*)**

307.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

308.    E.M. became a freshman at Oxford High School in September 2021.

309.    On November 30, 2021, E.M. was going about his usual day as a freshman student at Oxford High School, when he encountered E.C. in the hallway and E.C. shot him in the face, severely injuring him.

310.    E.M. resumed his classes at Oxford High School in 2022.

311.    E.M. would like to attend classes again in person in the fall of 2022.

312.    The Fourteenth Amendment to the United States Constitution forbids state actors from depriving any person of life, liberty, or property without due process of law.

313.    Based on the provisions of Michigan law regarding public education, the students of OCSD, including E.M., have a constitutionally protected right to a public education, which is protected as a property interest under the Due Process Clause of the Fourteenth Amendment.

314.    Defendants OCSD and Weaver must exercise their authority in the operations of the District consistent with constitutional safeguards.

315.    As alleged in this Complaint, the Oxford Defendants took affirmative state actions that, in accordance with official District policy, created the danger of deadly violence at Oxford High School, and which in fact caused the shooting at Oxford High School on November 30, 2021.

316.    Oxford High School remained closed, and its surviving students including E.M. were completely deprived of their right to a public education from November 30, 2021 until January 24, 2022.

317.    Since Oxford High School reopened on January 24, 2022, the District as well as then Superintendent Throne and current Superintendent Weaver, have failed to remedy the unconstitutional policies and customs that caused the shooting to occur, and have therefore deprived the surviving students, including E.M., of the full and equal enjoyment of their property right to a public education.

318.    Yet, to date, the OCSD has not undertaken any measures to restore the property right of Oxford High School students, including E.M., to the full enjoyment of a public education at Oxford High School.

319.   OCSD's failure to restore the full property interest of students to a public education include, and are not limited to:

a.   After the shooting, through then Superintendent Throne, the OCSD promised it would complete a thorough and independent investigation to review its actions and the events leading to the shooting.  To date, OCSD has not completed the investigation it promised to its students and community.

b.   OCSD maintains an unconstitutional policy of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue.  So long as this policy is maintained, the OCSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when E.C. was released from the counseling office to the classroom on November 30, 2021.

c.   OCSD maintains a policy of failing to train administrators that they can restrict suicidal and homicidal students from returning to the classroom.

d.   OCSD maintains a policy of failing to train administrators in how to complete a thorough and effective risk assessment for suicidal students.

e.   Since the shooting, OCSD has engaged in a concerted cover story of its actions leading to the shooting.  This includes, and is not limited to, asserting in court proceedings and in the media that it properly returned E.C. to the classroom on November 30, 2021, despite knowing he was suicidal, because his case did not present a "disciplinary issue" that would warrant keeping him in the counseling office that day.

320.   To redress and remedy these unconstitutional practices, E.M. requests the following prospective equitable and injunctive relief:

a.   An order requiring OCSD and/or Superintendent Weaver to complete the independent investigation of the actions and events leading to the school shooting on November 30, 2022.

b.   An order requiring OCSD and/or Superintendent Weaver to immediately cease its policy, practice, or custom of

concealment, misrepresentation, minimizing or avoidance and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence.

c.      An order requiring OCSD and/or Superintendent Weaver to immediately reform its policy of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary issue". So long as this policy is maintained, OCSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when E.C. was released from the counseling office on November 30, 2021.

d.      An order requiring OCSD and/or Superintendent Weaver to secure proper training for administrators to understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat of harm to themselves or others.

e.      An order requiring OCSD and/or Superintendent Weaver to secure proper training for administrators in how to conduct a proper risk assessment when students are suicidal.

f.      An order requiring OCSD and/or Superintendent Weaver to secure proper training for administrators to ask students and family members whether a student owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk.

g.      An order requiring OCSD and/or Superintendent Weaver to secure proper training for administrators and other staff of when and how to conduct a legal search of student belongings, including backpacks and lockers.

h.      An order requiring OCSD and/or Superintendent Weaver to publicly retract all statements made in the course of its cover story after the shooting, including a retraction of all statements suggesting that Hopkins and Ejak acted properly in releasing E.C. from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class.

i.   All other prospective equitable and injunctive relief the Court deems necessary to restore Plaintiff's property right to a full public education, as protected by the Due Process Clause of the Fourteenth Amendment.

## ACME CAUSES OF ACTION

### COUNT I
### Negligence

321.   Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

322.   Acme was subject, at all times, to a duty under both statutory and common law to responsibly train, supervise and monitor its employees to prevent straw purchasers and other dangerous parties from gaining access to firearms.

323.   Acme knowingly violated this duty in this case in a manner which allowed E.C. to gain access to a gun straw purchased by James Crumbley.

324.   Specifically, Acme employees, at minimum, willfully blinded themselves to a collection of clear indicators informing them that James Crumbley was a straw buyer supplying a juvenile.

325.   A juvenile's use of a gun obtained via a straw purchase in an unlawful act of gun violence – such as E.C. attacking one or more parties including E.M. of Oxford High School – was a foreseeable consequence of Acme's breach.

326.   Because Acme's breach directly and foreseeably contributed to E.M.'s injuries, he is entitled to recover under the law of negligence.

327.   Additionally, the various state and/or federal firearms laws that Acme knowingly violated, either directly or as an accomplice/co-conspirator, by completing the straw sale of the Acme gun were designed to prevent precisely the type of gun violence which foreseeably caused injury to E.M.

328.    These laws include, but are not necessarily limited to 18 U.S.C. §§ 3, 4, 922(a)(6), 922(m), 922(t), 922(x), 923(g), 924(a) and M.C.L.S §§ 600.3801, 750.234f.

329.    These laws were designed to protect all members of the public, including individuals like E.M.

330.    As explained above, Acme's knowing violation of one or more of these laws proximately led to E.M.'s harm by arming E.C. with the Acme gun.

331.    Thus, Acme's violation of these or more laws also constitutes prima facie evidence establishing the merit of Plaintiffs' negligence claim.

## COUNT II
## Negligent Entrustment

332.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

333.    Acme was subject, at all times, to a duty to avoid entrusting a dangerous instrument like the Acme gun to a party showing a heightened propensity to misuse it either directly or through one or more intermediaries.

334.    In this case, such a party would include a juvenile like E.C. whose access to firearms is limited by law because of a legislative recognition of the heightened danger of juvenile misuse of firearms.

335.    Acme knowingly breached this duty by supplying the Acme gun to James Crumbley with actual or constructive knowledge that he would transfer the Acme gun to E.C. and that E.C. was the intended user.

336.     A juvenile's use of a gun in an unlawful act of gun violence – such as the attack at Oxford High School – was a foreseeable consequence of Acme's breach.

337.    Because Acme's breach directly and foreseeably contributed to E.M.'s injuries, he is entitled to recover under the law of negligent entrustment.

## COUNT III
## Public Nuisance

338.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

339.    Michigan law defines a "nuisance" to include "[a] building, vehicle, boat, aircraft, or place . . . if … [i]t is used to facilitate armed violence in connection with the unlawful use of a firearm or other dangerous weapon." M.C.L.S. § 600.3801(1)(g).

340.    All parties are subject to a duty not to create a nuisance in violation of this law.

341.    Acme breached this duty because it chose to operate its store as a "building" or "place" which facilitated E.C.'s unlawful use of the Acme gun in the attack on Oxford High School.

342.    Specifically, Acme used the store as a venue to conduct an unlawful straw sale known to be a primary mechanism for parties like E.C. to acquire firearms later misused in crimes.

343.    E.M.'s injury with a bullet fired from the Acme gun was a foreseeable consequence of Acme's choice to create a public nuisance.

344.    Upon information and belief, Acme has persisted in the negligent and/or unlawful practices associated with the sale of the Acme gun since the attack on Oxford High School.

345.    As such, Acme is creating an ongoing public nuisance which continues to threaten E.M. and other members of the Oxford community.

346.    Plaintiffs have suffered a unique harm different from the harm inflicted upon other members of the community exposed to this public nuisance.

347.    Under Michigan law, "any resident of the county in which a nuisance described in section 3801 is located . . .  may maintain an action for equitable relief . . . to abate the nuisance." § 600.3805.

348.    Plaintiffs thus have standing to seek, and are entitled to, an injunction requiring Academy to cease its reckless and/or unlawful practices related to the sale of firearms at the Acme Store which perpetuate an ongoing nuisance.

### DAMAGES

349.    As a direct and proximately results of the actions of the Defendants, E.M. has suffered terror, shock, awareness of imminent death, excruciating pain, suffering and fear.

350.    As a further direct and proximate cause of the actions of the Defendants, E.M. has suffered severe emotional distress, post-traumatic stress disorder, sleep disturbance, nightmares, flashbacks, fear of attending school, and can be expected to continue to suffer such damages into the future.

351.    As a further direct and proximate cause of the actions of the Defendants, E.M. has suffered and will suffer losses into the future due to the injuries and damages he suffered to his mental health, face, jaw and teeth, including, but not limited to the reasonable expenses of necessary medical care and treatment, loss of earnings capacity, and all other damages that may be learned through the course of discovery.

WHEREFORE, Plaintiffs claim judgment against the Defendants in the amount to which they are found to be entitled, together with interest, costs, attorneys' fees, exemplary damages, punitive damages and relevant injunctive relief.

Respectfully submitted,

/s/ Matthew L. Turner
Matthew L. Turner (P48706)
Lisa M. Esser (P70628)
Sommers Schwartz, P.C.
One Towne Square, Suite 1700
Southfield, MI 48076
T: (248) 355-0300
F: (248) 936-2158
mturner@sommerspc.com
lesser@sommerspc.com

BRADY
Jonathan E. Lowy (*admission pending*)
Erin C. Davis (*admission pending*)
Robert Cross (*admission pending*)
Co-Counsel for Plaintiff
840 Street NE, Suite 400
Washington DC 20002
(202) 370-8106
jlowy@bradyunited.org
edavis@bradyunited.org
rcross@bradyunited.org

Dated: June 28, 2022

## JURY DEMAND

Plaintiffs MATTHEW and MARY MUELLER, as Co-Next Friends for their son

E.M., a minor, by and through their attorneys, SOMMERS SCHWARTZ, P.C., hereby

demand Trial by Jury in this matter on all issues so triable.

Respectfully submitted,


/s/ Matthew L. Turner
Matthew L. Turner (P48706)
Lisa M. Esser (P70628)
Sommers Schwartz, P.C.
One Towne Square, Suite 1700
Southfield, MI 48076
T: (248) 355-0300
F: (248) 936-2158
mturner@sommerspc.com
lesser@sommerspc.com

BRADY
Jonathan E. Lowy (*admission pending*)
Erin C. Davis (*admission pending*)
Robert Cross (*admission pending*)
Co-Counsel for Plaintiff
840 Street NE, Suite 400
Washington DC 20002
(202) 370-8106
jlowy@bradyunited.org
edavis@bradyunited.org
rcross@bradyunited.org


Dated: June 28, 2022